# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs July 21, 2009

## STATE OF TENNESSEE v. CHRISTOPHER LEE DAVIS

**Direct Appeal from the Criminal Court for Trousdale County**
**No. 07-55      John D. Wooten, Jr., Judge**

---

**No. M2008-01216-CCA-R3-CD - Filed April 19, 2010**

---

Following a jury trial, Defendant, Christopher Lee Davis, was found guilty of aggravated robbery, carjacking, attempt to commit especially aggravated kidnapping, all Class B felonies, and attempt to commit premeditated first degree murder, a Class A felony. The trial court sentenced Defendant as a Range I, standard offender, to twelve years for each Class B felony conviction and twenty-five years for his attempted premeditated first degree murder conviction. The trial court imposed a combination of consecutive and concurrent sentencing for an effective sentence of forty-nine years. On appeal, Defendant argues that (1) the trial court erred in denying his motion to suppress; (2) the evidence is insufficient to support his conviction of attempted premeditated first degree murder; (3) the trial court erred in determining the length of his sentences; and (4) the trial court erred in imposing consecutive sentencing. After a thorough review, we affirm Defendant's convictions and the length of his sentences. We remand this matter for a new sentencing hearing solely for the purpose of determining whether consecutive sentencing is appropriate under the Sentencing Act and *State v. Allen*, 259 S.W.3d 671 (Tenn. 2008).

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Circuit Court Affirmed in Part; Remanded**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Comer L. Donnell, District Public Defender; William K. Cather, Assistant Public Defender; and Tillman W. Payne, Assistant Public Defender, Lebanon, Tennessee, for the appellant, Christopher Lee Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Tom P. Thompson, District Attorney General; and Jason Lawson, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Glen McDaniel, the victim, testified that he dropped his girlfriend off at a convenience store on June 12, 2007, so that she could visit with friends. The victim then drove to a nearby carwash in his black Chevrolet Monte Carlo and pulled into one of the bays. The victim noticed a red pick-up truck and a black Chevrolet Impala parked at the carwash. While the victim was washing his vehicle, a gold Nissan Maxima pulled into the carwash. The victim said that he noticed that the two African-American men in the back seat were staring at him. The victim continued washing his vehicle until two African-American men entered the bay from opposite sides. The victim said that the men wore red tee shirts and red hats with bandanas covering the lower portion of their faces. The victim described one of the men as approximately six feet, three or four inches tall, and heavy set with dark complected skin. The other man, whom the victim identified at trial as Defendant, was approximately the same height but was thinner and had lighter complected skin. There was a one hundred dollar bill embroidered onto the front of Defendant's hat above the bill.

The larger man walked up to the victim, pointed a gun at his chest, and told the victim to get into the Monte Carlo. The victim said that he complied with the request because he was scared he would be shot if he refused. The armed man got into the front passenger seat, and kept his gun pointed at the victim. Defendant held his hand on the victim's shoulder as the victim sat down in the driver's seat, and then Defendant got into the back seat on the driver's side.

The victim said that the larger man asked him for $800, and the victim said that he did not have that much money on him. The victim told the men that he did not have a wallet, but he did have a debit card. The gunman told the victim to drive to an ATM located across the street from the carwash. When they arrived at the bank, the victim and the two men exited the vehicle, and the group walked up to the ATM. Defendant held his hand over one of the ATM's video cameras. The victim said that he was so nervous that he had to make two attempts before he entered his PIN correctly. Defendant asked the victim to get a receipt for the transaction in order to make sure that the victim had withdrawn all of the money in his checking account. The victim withdrew a sum of money, and the gunman took both the money and the receipt.

All three men got back into the victim's vehicle, and the victim drove back to the carwash. The men directed the victim to pull in behind the carwash next to the vacuum machines. The victim said that he saw Lacy Smotherman sitting in a parked vehicle so the men told the victim to drive down the street. The victim did so, then turned his vehicle

around and returned to the carwash. Ms. Smotherman was gone. The victim pulled into the first bay next to the automatic carwash, and the men told him to get out of the car. Defendant pushed the victim's face forward against the bay's wall. The victim told Defendant to take his vehicle and leave the victim at the carwash, but Defendant told the victim that he was going with them. The victim stated that he believed at that point that he was going to be killed. The victim said that he was standing with his chest pressed against the wall. Defendant grabbed his hands and tried to pull them behind the victim's back. The victim looked over his shoulder and saw that Defendant had a roll of black duct tape. The victim yanked his hands up, and Defendant tried to force the victim's arms down. Defendant hit the victim in the face near his eye, and the victim's head struck the wall, injuring his nose. Defendant said, "Get the gun, we're going to shoot this m____ f_____ right here."

The victim said that he "figured if [he] was going to get shot, [he] might as well try to run." The victim broke away from Defendant's grasp and ran toward a nearby restaurant. The victim looked over his shoulder and saw that Defendant was running approximately twenty to thirty feet behind him. The restaurant was closed so the victim ran toward a gas station. As he crossed the intersection, the victim looked back again and observed the black Chevrolet Impala pull out of the carwash followed by his Monte Carlo, with both vehicles headed in the same direction. The victim said that he fell over the counter inside the gas station, gasping for breath. The victim told the man behind the counter to call the police because he had just been "carjacked."

The victim provided a written statement to the police that night describing the incident. The videotape from the ATM's security camera was played for the jury, and the victim identified the man in the red shirt, red hat, and gloves portrayed in the videotape as the gunman. The victim said that the carwash bays were well-lighted. Although he avoided looking directly at the gunman, the victim said that he was within two feet of Defendant during the offenses and was able to clearly see his face. The victim said that Defendant appeared to be in charge, and Defendant gave orders to the man with the gun.

The victim received notice the following morning that his vehicle had been found at the Bledsoe Creek boat dock in Sumner County. The victim inspected his vehicle and said that the exterior of the vehicle had not been damaged. However, the vehicle's CD player had been pulled out from the dashboard and the rear amplifier was missing. The victim received another telephone call later that day notifying him that some of the missing items from his vehicle had been located. The victim drove to a house as directed, and a man came out and showed him a CD player and an amplifier, which the victim identified as his.

Jerry Scruggs testified that he was working at a gas station on June 12, 2007, when the victim ran into the station between approximately 9:30 p.m. and 10:00 p.m. Mr. Scruggs

said that the victim had blood running down his face and was gasping for breath. The victim told Mr. Scruggs that "those guys are trying to kill me." Mr. Scruggs called 911.

Mr. Scruggs stated that the following day he traveled to Rivergate Mall with his sister, Tammy Scruggs Reed, and nephew, Justin Scruggs. Justin Scruggs and the victim were friends. As the group drove past the boat dock area near the Bledsoe Creek Bridge, Justin Scruggs saw the victim's Chevrolet Monte Carlo in the parking lot. Mr. Scruggs said that the Monte Carlo was parked away from the water near the woods. The group called the Sumner and Trousdale County Sheriff's Departments, and law enforcement personnel from both counties soon arrived in unmarked vehicles. Mr. Scruggs said that a white Ford Crown Victoria drove slowly by the boat dock. Mr. Scruggs observed an African-American male looking at the group from the vehicle's front passenger window. The Crown Victoria continued up the road and turned around in a parking area, and then drove by the boat dock again.

Lacy Smotherman testified that she drove to the carwash on June 12, 2007, between 10:00 p.m. and 10:15 p.m. to throw away the trash in her vehicle. Ms. Smotherman said that she knew the victim because he was dating Ms. Smotherman's friend, Amber Presley. Ms. Smotherman noticed a gold Nissan Maxima backed into the first bay. A man was standing near the front of the vehicle. Ms. Smotherman drove to the back of the carwash and observed the victim's Monte Carlo pull into the area. Ms. Smotherman said that the victim was in the driver's seat, and an African-American man with a bandana over his face was sitting in the front passenger seat. Ms. Smotherman did not have a clear view of the person in the back seat. Ms. Smotherman said that she was surprised when the victim drove off within speaking to her.

Deangelo Vaughan testified that he was employed by an auto parts store in June 2007. Mr. Vaughan said that two men drove into the store's parking lot in a white Crown Victoria. The men offered to sell Mr. Vaughan four twenty-two inch tires for $500. The men said that the tires were still on the vehicle, and the vehicle was parked at the lake. Mr. Vaughan said that the price named by the men was "awfully cheap." Mr. Vaughan told the men he could not leave the store, and the men left. Mr. Vaughan said that he later saw the photographs of four men in a local newspaper and recognized two of the men as the ones who had tried to sell him the tires. Mr. Vaughan contacted the Trousdale County Sheriff's Department and provided a written statement.

Detective Chris Tarlecky, with the Sumner County Sheriff's Department, testified that he received a dispatch on June 13, 2007, from the Trousdale County Sheriff's Department to be on the lookout for a black Chevrolet Monte Carlo which had been stolen the night before in Hartsville. The Monte Carlo was later discovered at the Bledsoe Creek boat dock.

Detective Tarlecky stated that the vehicle's doors were locked, but he observed through the car window that the CD player had been removed from the dashboard. Detective Tarlecky said that he observed a white Ford Crown Victoria begin to make a right hand turn into the boat dock. Detective Tarlecky stated that the passenger's "eyes seemed to get real big when [he] looked down and saw" the group gathered at the boat dock. The Crown Victoria "abruptly turned left" back on to the pavement and continued across the Bledsoe Creek Bridge. The vehicle made a u-turn in a church parking lot and drove past the boat dock again. Detective Tarlecky activated his vehicle's emergency lights and initiated a stop of the Crown Victoria. Detective Tarlecky identified the driver as James Phillips, and Defendant as the passenger. Mr. Phillips consented to a search of the vehicle. Detective Tarlecky said that he found a Chevrolet key chain in the door panel on the front driver's side, and tossed the keys to Sheriff Ray Russell with the Trousdale County Sheriff's Department. Sheriff Russell returned approximately three minutes later and gave a signal indicating that the car keys fit the Monte Carlo, and Mr. Philips and Defendant were taken into custody.

Detective Tarlecky stated that there were several completed job applications in the vehicle, one of which was filled out by Marcus Bradford with an address listed as 1100 Winwood Drive in Castalian Springs. Detective Tarlecky went to the Castalian Springs address and spoke with Mr. Bradford. Mr. Bradford confirmed that he lived in the residence and gave his consent to a search of his bedroom and the common areas of the house. Detective Tarlecky found a large speaker box in the living room, and a CD player with part of a dashboard attached to it. A large amplifier of the same brand as the victim's amplifier and a blue backpack were found in what Detective Tarlecky referred to as the "game room." The blue backpack contained a red "do rag" and a red hat with a one hundred dollar bill above the bill. A number of CD's and a black bandana were found in Mr. Bradford's bedroom. Other items recovered from the residence included a wallet with Defendant's identification and a blue travel bag containing a roll of duct tape. A red tee-shirt was found in the dryer.

Mr. Bradford told Detective Tarlecky that Michelle Guardiola and Michael Miller were listed as the lessees on the lease. Ms. Guardiola and Mr. Miller were contacted and asked to return to the residence. The couple arrived in a black Chevrolet Impala and gave their consent to a search of the entire house. Detective Winnett testified that he also searched Mr. Miller's Impala and found a red tee-shirt and what appeared to be wiring from a car stereo. On cross-examination, Detective Winnett stated that none of the clothing found during the search was submitted for DNA analysis.

Sheriff Russell testified that he contacted an employee of the bank where the ATM was located at approximately 11:30 p.m. on June 12, 2007, and the employee met him at the bank so that he could view the videotapes from the bank's security cameras. The next day,

Sheriff Russell and Detective David Winnett drove to the Bledsoe Creek boat dock. While they were at the scene, a white Ford Crown Victoria drove past the parking area, turned around on the other side of the bridge, and drove by a second time. Sheriff Russell said that the detectives from the Sumner County Sheriff's Department initiated a stop of the vehicle. Sheriff Russell confirmed that the set of car keys retrieved from the Crown Victoria fit the victim's vehicle. Sheriff Russell said that Defendant and James Phillips were the occupants of the Crown Victoria.

Sheriff Russell participated in a second search of the 1100 Winwood Drive residence during which a lockbox was discovered. Sheriff Russell said that a set of keys fitting the lockbox was found among Defendant's personal items which had been removed from him after his arrest. The lockbox contained a high point 40 millimeter semi-automatic pistol and ammunition.

At trial, the parties stipulated that Defendant's fingerprints were found on a gold Nissan Maxima later recovered by the investigating officers.

## II. Suppression of Evidence

Defendant argues that the investigating officers did not have the reasonable suspicion necessary to initiate a stop of Mr. Phillip's vehicle, and that all evidence seized as a result of the search of the vehicle and the later searchs of the residence on Winwood Drive should be suppressed. The State argues first that Defendant, as a passenger, does not have standing to challenge the search of Mr. Phillips' vehicle, and, alternatively, that the initial stop of the vehicle passes constitutional muster.

At the suppression hearing, Detective Tarlecky testified that he received a "be on the lookout" dispatch on June 13, 2007, from the Trousdale County Sheriff's Department. The dispatch was introduced as an exhibit at the hearing. The dispatch requested local law enforcement agencies to be on the lookout for a black 2001 Chevrolet Monte Carlo which had been stolen on June 12, 2007. The dispatch stated that the stolen vehicle had twenty-two inch custom wheels and displayed Tennessee tag number 331GDN. The dispatch also described the suspects as:

"1. A B/M over 6 ft. 225 lbs. wearing red tee shirt, red bandanna, and red cap.
Armed with a stainless pistol.

2. A B/M 6 ft. slender build wearing a red bandanna and a red cap.

3. A B/M 5'8" - 5'9" wearing a [black] shirt and cap."

The dispatch advised that the suspects were last seen traveling southbound on Broadway in a gold Nissan Maxima.

Detective Tarlecky said that he received a telephone call on June 13, 2007, notifying him that a black Chevrolet Monte Carlo had been spotted near the Bledsoe Creek bridge. Detective Tarlecky and Detective Ron Brunner traveled to the site in unmarked vehicles. Sheriff Ray Russell and Detective David Winnett from the Trousdale Sheriff's Department also arrived in an unmarked vehicle. Detective Tarlecky stated that the Monte Carlo was parked in the right hand corner of the parking lot. Detective Tarlecky verified that the license tag number on the vehicle matched the tag number provided in the dispatch.

Detective Tarlecky said that the Monte Carlo's custom wheels, which he valued at approximately $2,000, were still on the vehicle. Detective Tarlecky stated that in his experience, individuals would often return to the stolen vehicle either to move it to a new location or to collect additional items from the vehicle. Detective Tarlecky was conferring with other officers about securing the crime scene when his attention was called to a white Ford Crown Victoria. Detective Tarlecky stated:

> I could see that they were making a right hand turn in the boat ramp, meaning they were traveling from Gallatin. I could tell that they were off the traveled portion of the road on the shoulder going into their right hand turn. When we all looked up at them, they looked down directly at us and abruptly cut the wheel to the left and went back out on the traveled portion of the roadway.

Detective Tarlecky observed two African-American males in the front seat of the vehicle. Detective Tarlecky said that the men's "eyes opened as big as saucers when they saw us." Detective Tarlecky stated that the vehicle crossed the Bledsoe Creek Bridge at a speed of approximately forty miles per hour which was below the posted speed limit of fifty-five miles per hour. The vehicle turned into a church's parking lot, made a loop, and drove back over the bridge toward Gallatin. Detective Tarlecky said that in his experience a driver who makes a turn after noticing the presence of police officers is generally trying to avoid attention. Detective Tarlecky decided to activate his emergency equipment and initiate a stop of the vehicle based on the information provided in the police dispatch, the behavior of the driver of the Crown Victoria, and the presence of the stolen Monte Carlo at the boat dock.

After the Crown Victoria was stopped, Detective Tarlecky asked the driver of the vehicle to step out, and he observed that the driver, who identified himself as Mr. Phillips, was wearing a red hat. Mr. Phillips told Detective Tarlecky that the car belonged to the girlfriend of his cousin, Michael Miller. The passenger was identified as Defendant. Mr. Phillips consented to the search of his vehicle, and Detective Tarlecky found a key ring

containing a Chevrolet key in the driver's side door panel. Sheriff Russell confirmed that the key fit the Monte Carlo parked at the boat ramp.

On cross-examination, Detective Tarlecky said that there were people fishing in the creek when he arrived at the boat dock, and two vehicles were parked on the opposite side of the parking lot from the Monte Carlo. Detective Tarlecky acknowledged that the area was used for a variety of activities besides fishing. Detective Tarlecky said that Ms. Scruggs was the first one to notice the Crown Victoria and called out to the others that there was a vehicle "with some black males in it." Detective Tarlecky acknowledged that the driver of the vehicle was not committing a traffic violation, but he reiterated that he believed the men might have been involved in the offenses committed the night before based on the information in the police dispatch and the circumstances presented at the time.

A trial court's findings of fact in a suppression hearing will be upheld by this Court unless the evidence preponderates otherwise. *State v. Williams*, 185 S.W.3d 311, 314 (Tenn. 2006) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, this Court is not bound by the trial court's conclusions of law. *State v. Randolph*, 74 S.W.3d 330, 333 (Tenn. 2002). The application of the law to the facts found by the trial court are questions of law that this court reviews de novo. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

Both the federal and state constitutions offer protection from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 7. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ." Article I, section 7 of our own constitution similarly provides that "the people shall be secure in their persons . . . from unreasonable searches and seizures . . . ." "The basic constitutional rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression." *State v. Day*, 263 S.W.3d 891, 901 (Tenn. 2008) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022 (1971); *State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997)). The basic rule, however, is subject "to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967)); *see also State v. Berrios*, 235 S.W.3d 99, 104 (Tenn. 2007). Fourth Amendment concerns attach to "all seizures of the person,

including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S. Ct. 2574, 2578 (1975) (citation omitted); *see Terry v. Ohio*, 392 U.S. 1, 16-19, 88 S. Ct. 1868, 1877-79 (1968)).

"An automobile stop constitutes a seizure within the meaning of both the Fourth Amendment of the United States Constitution and Article I, Section 7 of the Tennessee Constitution." *State v. Luke*, 995 S.W.2d 630, 635 (Tenn. Crim. App. 1998) (citing *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450, 110 S. Ct. 2481, 2485 (1990); *State v. Pulley*, 863 S.W.2d 29, 30 (Tenn. 1993); *State v. Binion*, 900 S.W.2d 702, 705 (Tenn. Crim. App. 1994)). However, "a police officer may make an investigatory stop when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *State v. Bridges*, 963 S.W.2d 487, 492 (Tenn. 1997) (citations omitted); *see also Terry*, 392 U.S. at 2, 88 S. Ct. at 1880. Our supreme court has noted:

> [i]n determining whether a police officer's reasonable suspicion is supported by specific and articulable facts, a court must consider the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 695 (1981). This includes, but is not limited to, objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. *Id.*, 449 U.S. at 418, 101 S. Ct. at 695. A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him. *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880.

*State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992).

Initially, we observe that we agree with the State's argument that Defendant lacked standing to challenge the search of Mr. Phillips' vehicle after it was stopped. The United States Supreme Court has concluded that passengers of a vehicle who "asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized," failed to establish a legitimate expectation of privacy in the areas of the vehicle subjected to a search and thus were not entitled to challenge a search of those areas. *Rakas v. Illinois*, 439 U.S. 128, 140-48, 99 S. Ct. 421, 428-33 (1978) Id. at 140-148, 99 S. Ct. at 428-33; *see also State v. Cothran*, 115 S.W.3d 513, 521 (Tenn. Crim. App. 2003) (concluding that without evidence of any interest in the vehicle or the items seized, a defendant who had been a passenger in the searched vehicle earlier that day"lacked standing to challenge the search of Alfred Smith's truck and the seizure of the items found inside the truck").

However, Defendant's challenge is not directed to the search of Mr. Phillips' vehicle after the traffic stop, but to the constitutionality of the traffic stop itself. A traffic stop constitutes a seizure under the Fourth Amendment of not only the driver of the vehicle but its occupants as well. *Brendlin v. California*, 551 U.S. 249, 255-56, 127 S. Ct. 2400, 2406 (2007). Accordingly, a passenger may challenge the initial stop and detention of the vehicle in which he is riding under Fourth Amendment principles. *Id*. at 255-56, 127 S. Ct. at 2406. Accordingly, we will address the merits of Defendant's issue.

Defendant argues that, although Detective Tarlecky may have had a "hunch" based on his police experience, he did not have a reasonable basis for suspecting that anyone in the Crown Victoria was involved in some type of criminal activity. The Supreme Court has cautioned that a detention based on anything less than "specific and articulable facts together with rational inferences from those facts" would "invite intrusions upon constitutionally granted rights based on nothing more substantial than inarticulate hunches." *Terry*, 392 U.S. at 21-22, 88 S. Ct. at 1880.

In viewing the totality of the circumstances surrounding the traffic stop, our supreme court has explained that "reasonable suspicion 'is dependent upon both the content of information possessed by police and its degree of reliability.'" *Day*, 263 S.W.3d at 903 (quoting *White*, 496 U.S. at 330, 110 S. Ct. 2412). Other factors that may determine the existence of reasonable suspicion include the characteristics of the area and the behavior of the driver. *State v. Lawson*, 929 S.W.2d 406, 408 (Tenn. Crim. App. 1996). While an officer's hunch is insufficient to justify an investigative stop, the level of reasonable suspicion required to support an investigatory stop is lower than that required for probable cause. *Day*, 263 S.W.3d at 902 (citing *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412 (1990); *Pulley*, 863 S.W.2d at 31).

The trial court found that Detective Tarlecky did articulate a reasonable suspicion for stopping Mr. Phillips' vehicle, and the evidence supports the trial court's findings. Detective Tarlecky received a dispatch from the Trousdale County Sheriff's Department at 8:38 a.m. on June 13, 2007, concerning a carjacking which occurred around 10:00 p.m. in Hartsville the night before. The dispatch provided information concerning the stolen vehicle as well of a general description of the suspects based on the victim's statement. A vehicle with the same license tag number as provided in the dispatch was found approximately two hours later, and the victim identified the vehicle as his. A short time later, Detective Tarlecky observed a white vehicle with two male African-American occupants meeting the general description provided in the dispatch begin to turn into the parking lot in which the victim's vehicle was parked. Detective Tarlecky noticed the startled expression on the passenger's face, and the vehicle abruptly swung back on to the road and proceeded across the Bledsoe Creek Bridge traveling below the posted speed limit. The vehicle then turned around and

came back down the road, still traveling at a slow rate of speed. Detective Tarlecky stated that in his experience the driver's behavior signaled a wish to avoid attention, and he was aware that individuals often returned to a parked stolen vehicle to remove other items from the vehicle.

Based on the foregoing, we conclude that Detective Tarlecky had reasonable suspicion supported by specific and articulable facts to conduct an investigatory stop, and the trial court did not err in denying Defendant's motion to suppress. Defendant is not entitled to relief on this issue.

## III.  Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his conviction of attempted first degree premeditated murder. Specifically, Defendant contends that there was no proof that Defendant took a substantial step to complete the commission of the charged offense.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id*.; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

First degree murder is defined in relevant part as the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Premeditation refers to "an act done after the exercise of reflection and judgment." *Id*. § 39-13-202(d). Premeditation "means that the intent to kill must have been formed prior to the act itself." *Id*. However, the intent to kill need not pre-exist in the mind of the accused for any definite period of time. *Id*. The

-11-

existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. *Bland*, 958 S.W.2d at 660. A person commits "criminal attempt" by acting "with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3). "Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense." *Id*. § 39-12-101(b).

Defendant argues that no evidence was presented of any actual attempt on the victim's life, or that his co-defendant "actually responded to the directive to 'get the gun.'" Citing *State v. Reeves*, 916 S.W.2d 909 (Tenn. 1996), Defendant further contends that there was no proof of any plan to kill the victim. Defendant suggests that his directive to "get the gun" was merely a bullying tactic made for the purpose of intimidating the victim and not as an indication of an intent to kill him.

Prior to the codification of Tennessee Code Annotated section 39-12-101, the criminal attempt law was that "mere preparation" to commit an act was insufficient to support a conviction for attempt to commit that act. *Id*. at 913; *Dupuy v. State*, 325 S.W.2d 238 (1959). Instead, under *Dupuy*, conduct did not constitute a substantial step towards the commission of a crime unless there was some overt act that went beyond the preparation to commit the act at issue. *Dupuy*, 325 S.W.2d at 240. "The overt act element required a distinction between conduct that was merely preparatory and conduct that constituted a 'direct movement toward the commission after the preparations had been made.'" *State v. Fowler*, 3 S.W.3d 910, 911 (quoting *Reeves*, 916 S.W.2d at 911). In *Reeves*, our supreme court concluded that the use of the phrase "substantial step" in the newly enacted section 39-12-101 signaled an abandonment of the *Dupuy* approach and "held that the mere preparation test was inconsistent with the current legislative language and the goal of preventing crimes." *Fowler*, 3 S.W.3d at 912 (citing *Reeves*, 916 S.W.2d at 914).

In *Reeves*, two high school students conspired to kill their teacher by placing rat poison in her drink. One of the students brought the rat poison to school the next day in her purse. The two students placed the purse next to their teacher's drink which was on her desk, but the students ran back to their seats when the teacher entered the room. The rat poison was later found in the student's purse. The *Reeves* court concluded that the defendants' conduct in that case was a substantial step towards the commission of second degree murder where the defendants possessed materials to be used in the commission of the crime at or near the scene of the crime, and the possession of those materials served no lawful purpose under the circumstances. *Id*. at 914. The court observed that

[requiring an overt act] severely undercuts the objective of prevention [of crimes]. . . . Once a person secretly places a toxic substance into a container from which another person is likely to eat or drink, the damage is done. Here if it had not been for the intervention of the teacher, she could have been rendered powerless to protect herself from harm.

*Id*.

In the case *sub judice*, the co-defendant's gun was continually pointed toward the victim during the commission of the aggravated robbery and carjacking offenses. Defendant informed the victim that he would not be allowed to go free and pulled out duct tape. Defendant attempted to bring the victim's arms behind his back so that the victim could be restrained with the tape. Defendant then hit the victim in the face and told his companion to "[g]et the gun, we're going to shoot this m____ f____ right here." Fortunately, the victim managed to free himself from Defendant's grasp and run toward a point of safety with Defendant closely pursuing him. Viewing the evidence in a light most favorable to the State, we conclude that the possession of duct tape, a weapon, the threat to shoot the victim "right now," and Defendant's pursuit of the victim when he fled is sufficient to support a finding by a rational trier of fact that Defendant attempted to kill the victim and that he acted with premeditation. *See State v. Suttles*, 30 S.W.3d 252, 261 (Tenn.2000) (noting that several factors, including the use of a deadly weapon upon an unarmed victim, support a finding of premeditation). Defendant is not entitled to relief on this issue.

## IV.  Sentencing Issues

At the sentencing hearing, Judy Kerr, with the Tennessee Board of Probation and Parole, testified that she prepared Defendant's presentence report, which was introduced as an exhibit without objection. At the time of the sentencing hearing, Defendant was twenty years old. He reported that he dropped out of high school in the tenth grade. Defendant told Ms. Kerr that he had completed his GED, but Ms. Kerr verified that Defendant had, in fact, failed his pretest for the GED exam and had never returned to the class. As employment, Defendant reported working for a fast food restaurant from January 2005 until his arrest in August 2005 on a murder charge. Defendant stated that he did not have a relationship with his family, and that he stayed with friends. Defendant reported that "he [had] sold drugs for a living since he was thirteen years old."

Ms. Kerr said that when Defendant was seventeen years old, he was charged  with criminal homicide and unlawful possession of a weapon.  When he turned eighteen, Defendant was indicted on the charges as an adult but the charges were dismissed on February 28, 2007.  Ms. Kerr said that Defendant has one prior conviction, in 2006, for an

assault committed while he was in the Davidson County Jail awaiting trial on the murder charge. Defendant was sentenced to sixty days in confinement for this offense. Defendant reported joining the Bloods gang when he was eleven years old and was a member in both Davidson and Henry County. Defendant said that he obtained the rank of "00G status" which is the highest rank within the gang. As proof of his membership in the gang, Defendant stated that he has three burns in the shape of a triangle on his right upper arm. Defendant, however, said that he was no longer a member of the gang at the time the presentence report was prepared.

According to the victim's impact statement, the victim still suffered emotional distress and depression as a result of the incident and reported feeling scared when in a crowd or outside his home at night. The victim wrote, "I am totally and completely angry that this happened to me. I was shocked that someone could actually do this to another human being without the slightest regard for another human life or the effect it would have on all our futures." The victim stated that he was forced to sell his vehicle because he was afraid for his life and that of his friends and family.

In determining the length of his sentence, the trial court observed that under the 2005 amendments to the sentencing law, the trial court has the discretion to impose a sentence anywhere between the minimum and maximum sentences in the range. The trial court noted that the statutory enhancement factors were advisory only and expressed its belief that specific findings of fact were no longer required concerning which enhancement factors were considered. The trial court found, however, that Defendant had a prior criminal record even though his prior conviction was for misdemeanor assault. *See* T.C.A. § 40-35-114(1). The trial court stated, "And so that, in my mind, is a solid guideline by which I can move him within the range all the way to the top in each range." The trial court then discussed the applicability of several enhancement factors, noting that Defendant's role as a leader in the commission of the offense, the fact that he treated the victim with exceptional cruelty, and Defendant's lack of hesitation about committing a crime when the risk to human life was high were "compelling" or "solid" advisory guidelines. *See id*. § 40-35-114(2), (5), (10). The trial court stated, however, "I make clear for our record here, I am making no specific findings of fact in addition to that which a jury would be able to find. I'm not going to do that." After considering the principles of sentencing, the circumstances of the offenses, and Defendant's prior criminal history, the trial court sentenced Defendant as a Range I, standard offender, to twelve years for each Class B felony conviction and twenty-five years for his Class A felony conviction.

In determining the manner of service of the sentences, the trial court observed that it believed that Tennessee's statutory framework for the imposition of consecutive sentencing, with the exception of a consideration of a defendant's prior criminal history, violated the

principles set forth in *Cunningham v. California*, 549 U.S. 270, 127 S. Ct. 856 (2007)) and *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). However, the trial court found that under the general principles of sentencing and the "inherent power" of the trial court, some imposition of consecutive sentencing was appropriate based on the facts and circumstances of the case. Accordingly, the trial court imposed a combination of concurrent and consecutive sentences which resulted in an effective sentence of forty-nine years.

On appeal, Defendant argues that the trial court erred in enhancing each of Defendant's sentences to the maximum sentence in the sentencing range. Defendant agrees with the trial court's position on the constitutionality of Tennessee Code Annotated section 40-35-115, but he contends that the trial court erred in ordering consecutive sentencing based on the "inherent power" of the trial court.

A. Standard of Review

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. See T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is de novo. *Carter*, 254 S.W.3d at 345 (quoting *State v. Shelton,* 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992); *State v. Pierce*, 138 S.W.3d 820, 827 (Tenn . 2004)).

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *Carter*, 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id*.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the

principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

As a Range I, standard offender, Defendant is subject to a sentence of between eight and twelve years for each Class B felony conviction, and to a sentence of between fifteen and twenty-five years for his Class A felony conviction.

## B. Length of Sentence

Before addressing Defendant's challenge to the length of his sentence, we would first like to address the trial court's observations concerning the effect of the 2005 amendments to the 1989 Sentencing Act (the "Sentencing Act") on our sentencing scheme. Briefly, prior to 2005, an individual charged with a particular offense was entitled to a statutorily mandated presumptive sentence upon a verdict of guilty by a jury. T.C.A. § 40-35-210(c) (2004) (Repealed). The presumptive sentence, however, could be elevated by the trial court if it found the presence of one or more additional enhancement factors by a preponderance of the evidence. *See id*. §§ 40-35-113, -114 (2004). The United States Supreme Court though "has repeatedly held that, under the Sixth Amendment, any fact[, other than a prior conviction,] that exposes a defendant to a greater potential sentence [than the one established by statute,] must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." *Cunningham*, 549 U.S. at 275, 281, 127 S. Ct. at 860, 863-64.

In view of *Cunningham*, our supreme court concluded that Tennessee's pre-2005 Sentencing Act was constitutionally infirm "insofar as it allowed a presumptive sentence to be enhanced based on judicially determined facts." *State v. Gomez*, 239 S.W.3d 733, 740 (Tenn. 2007). Sensing the vulnerability of our sentencing structure to Sixth Amendment challenge, however, our legislature amended the Sentencing Act in 2005 prior to the *Gomez* decision. Under the amendments, an accused is no longer entitled to a presumptive minimum sentence upon conviction but, rather, is subject to a sentence anywhere within a statutorily established sentencing range based on the accused's sentencing classification. T.C.A. § 40-35-210(c)(2006). As explained later by our supreme court, 'the trial court is [now] free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]."' *Carter*, 254 S.W.3d

at 343. As guidance in its sentencing determinations, the trial court may consider, but is not required to do so, statutory enhancement and mitigating factors which are advisory only. *Id.* at 346. The weight assigned to the applicable factors is left solely to the trial court's discretion and may not be challenged on appeal. T.C.A. §§ 40-35-401, -402 (2006); *Carter*, 254 S.W.3d at 344.

As the trial court in the case *sub judice* observed, the establishment of advisory sentencing guidelines which the trial court "'shall consider, but is not bound by,'" "increases the amount of discretion a trial court may exercise when imposing a sentencing term." *Carter*, 254 S.W.3d at 344. However, as observed by the United States Supreme Court:

> We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. . . For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deemed relevant.

*United States v. Booker*, 543 U.S. 220, 233, 125 S. Ct. 738, 750 (2005). Thus, state sentencing schemes such as Tennessee's which "permit judges 'to exercise broad discretion . . . within a sentencing range'" do not run afoul of Sixth amendment principles." *Cunningham*, 549 U.S. at 294, 127 S. Ct. at 871 (quoting *Booker*, 543 U.S. at 233, 125 S. Ct. at 750).

With that in mind, we return to the role advisory sentencing guidelines play in a trial court's sentencing determinations. In sentencing a defendant, the trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b).  One of the advisory guidelines directs the trial court to adjust the length of a sentence by enhancement and mitigating factors, if appropriate.  *Id*. -210(c)(2).

Thus, while advisory, the statutory enhancement and mitigating factors continue to play an important role in a trial court's sentencing determinations.  *See Booker*, 543 U.S. at 253-254, 125 S. Ct. at 761 (noting that the retention of advisory sentencing guidelines in the federal sentencing structure recognizes that "uniformity does not consist simply of similar sentences for those convicted of violations of the same statute . . . [but] more importantly, of similar relationships between sentences and real conduct").  Thus, as explained in *Booker*, two defendants charged with the same criminal offense may appropriately receive different sentences within the sentencing range because the conduct of one defendant in committing the offense was more egregious than the conduct of the other.  *Id*. at 252, 125 S. Ct. at 760.

However, under our statutes, if a trial court determines that a particular factor is appropriate to the case before it, the trial court must "place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing."  *Id*. at -210(e). "Once applied, the chosen enhancement factor becomes a sentencing consideration subject to review under Tennessee Code Annotated section 40-35-210."  *State v. Osborne*, 251 S.W.3d 1, 26 (Tenn. Crim. App. 2007).

In the present case, Defendant argues that the trial court erred in considering enhancement fact (10), that Defendant had no hesitation about committing a crime when the risk to human life was high.  *See* T.C.A. § 40–35-114(10).  We agree that enhancement factor (10) is not applicable based on the circumstances surrounding the offenses.  This Court has previously held that this enhancement factor is inherent in every murder or attempted murder conviction, and thus may not serve to enhance a defendant's sentence unless the defendant endangers the lives of people other than the victim, which is not the case here.  *State v. Kelley*, 34 S.W.3d 471, 480 (Tenn. Crim. App. 2000); *State v. Nix*, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995).

Nonetheless, in the case *sub judice*, the trial court, although commenting on the appropriateness of several enhancements factors, specifically declined to place these observations on the record as sentencing considerations, although under *Cunningham*, *Gomez*, and *Carter*, it certainly could have done so if it had so chosen in the exercise of its discretion.  Instead, the trial court considered Defendant's prior conviction, the circumstances of the offenses, and the principles of sentencing to set Defendant's sentences for each

conviction at the top of the applicable sentencing range. Certainly, consideration of enhancement factor (1) was proper. *See* T.C.A. § 40-35-114(1). We also observe that even though this prior conviction was a misdemeanor rather than a felony as Defendant points out on appeal, Defendant, who was twenty years old at the time of the sentencing hearing, acknowledged that he has earned his living selling drugs since he was thirteen years old. Enhancement factor (1) contemplates consideration of both a defendant's prior convictions and his or her prior criminal behavior. *State v. Scott*, 735 S.W.2d 825, 830 (Tenn. Crim. App. 1987), *rev'd on other grounds State v. Adams*, 864 S.W.2d 31, 35 (Tenn. 1993).

Based on our review, we conclude that the length of Defendant's sentences were within the applicable sentencing range for each conviction and imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act. Defendant is not entitled to relief on this issue.

## C. Consecutive Sentencing

During Defendant's sentencing hearing, the trial court expressed its belief that Tennessee's consecutive sentencing statute, Tennessee Code Annotated section 40-35-115, was unconstitutional because it required the court to find additional facts before imposing consecutive sentencing. The trial court, however, found that some combination of consecutive and concurrent sentencing was appropriate and that its authority to do so rested with the "inherent powers" of the trial court. The State argues that the basis for the trial court's imposition of consecutive sentencing was improper and asks this Court to remand to the trial court for a new sentencing hearing solely on the issue of consecutive sentencing.

Although various panels of this Court had concluded that the trial court's imposition of consecutive sentencing under our sentencing scheme did not implicate Sixth Amendment concerns, *see, e.g. State v. Joseph Wayne Higgins*, No. E2006-01552-CCA-R3-CD, 2007 WL 2792938, at *14 (Tenn. Crim. App., at Knoxville, Sept. 27, 2007), *no perm. to appeal filed*, at the time of Defendant's sentencing hearing, neither the United States Supreme Court nor our supreme court had filed an opinion specifically addressing a trial court's authority to determine the manner of service of a defendant's sentences for multiple convictions. However, on June 24, 2008 after Defendant's sentencing hearing was conducted, our supreme court held that:

> [t]he decision whether to impose consecutive sentences for multiple crimes is a decision about the manner in which a defendant serves his or her multiple punishments. Whether or not to "stack" sentences for multiple crimes is therefore akin to a trial court's decision as to how and where a defendant serves his sentences: on probation, on community corrections, in split

-19-

confinement, or in the penitentiary. *Apprendi* and *Blakely* simply do not require the jury to determine the manner in which a defendant serves multiple sentences. That Tennessee's statutes require (in most instances) trial courts to make specific factual findings before imposing consecutive sentences does not extend the reach of *Apprendi* and *Blakely*.

*State v. Allen*, 259 S.W.3d 671, 689 -690 (Tenn. 2008). On January 14, 2009, after the submission of Defendant's brief on appeal, the United States Supreme Court concluded that a defendant's constitutional right to trial by jury is not implicated by sentencing structures, such as Tennessee's, which require the trial court "to make certain predicate fact findings" before imposing consecutive sentencing. *Oregon v. Ice*, ___ U.S. ___, 129 S. Ct. 711, 715 n.3, 716-720 (2009).

The statute requires certain findings to be made before a trial court can order consecutive sentences. *See* T.C.A. § 40-35-115(b). Because the trial court did not make any such findings, it erred in ordering the Defendant to serve consecutive sentences. Accordingly, we remand this case for the sole purpose of determining the manner of service of Defendant's sentences in accordance with the Sentencing Act.

## CONCLUSION

After a thorough review, we affirm Defendant's convictions and the length of his sentences. We remand this matter for a new sentencing hearing solely for the purpose of determining whether consecutive sentencing is appropriate under the Sentencing Act and *State v. Allen*.

_____
THOMAS T. WOODALL, JUDGE